UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
:
ROGER O. LODGE, : **MEMORANDUM**
: **DECISION AND ORDER**
Plaintiff, :
: 12 Civ. 4651 (BMC)
- against - :
:
COMMISSIONER OF SOCIAL SECURITY, :
:
Defendant. :
----------------------------------------------------------- X

**COGAN**, District Judge.

This case presents a challenge to a decision of the Commissioner of Social Security that plaintiff was not disabled as of the date he filed his application for supplemental security income. The issue to be determined is whether a consultative expert's report constitutes substantial evidence to support the finding of the Administrative Law Judge when there is no contrary evidence, or, instead, whether the ALJ should have compelled additional testing to further interpret the test results obtained by the consultative expert. What is really going on is that the consultative expert interpreted the test results one way, and plaintiff's attorney, who clearly has some background in interpreting these kind of results, asserts that the numbers should be viewed another way, or at least more testing should have been done to delve further into them.

But there is nothing irregular or facially questionable about the interpretation of the test results as set forth in the consultative expert's report, and the ALJ did not have to treat plaintiff's attorney as a competing "expert" to look behind it, or view counsel's argument as the basis for getting a second opinion on that report. Since the consultant's report appears sound; it is the primary evidence in the record addressing plaintiff's alleged disability; and there exist no other records that the ALJ could have obtained, the consultative expert's opinion constitutes

substantial evidence in support of the ALJ's decision. I therefore grant judgment on the pleadings in favor of defendant.

## BACKGROUND

When plaintiff submitted his application for disability benefits, there was little or nothing in the application that suggested a mental or cognitive disorder. Plaintiff listed his impairments as Type I diabetes, scoliosis, and high blood pressure, manifesting as constant pain, fatigue, and diarrhea. Plaintiff started off *pro se*, and the ALJ had duly collected most of plaintiff's available medical records. They all pertained to these conditions. The initial hearing was adjourned when plaintiff indicated he wanted to obtain legal counsel, and he thereafter did retain Queens Legal Services (the same LSO representing him in this case) to represent him at the hearing. Prior to the adjourned date of the hearing, and continuing during it, counsel alerted the ALJ that plaintiff's problem might actually be a cognitive impairment of some kind.

The transcript of the hearing shows that counsel's concern was well-based, and the ALJ perceived it as well. One would not know that based on the medical records; to the contrary, plaintiff's history showed that he had spent time in "gifted child" classes, had never been psychologically evaluated or considered for special education classes, had graduated high school (albeit at age 21), had the ability to drive and take public transportation, and had held various part time and at least one full time job (albeit sporadically and briefly). His mother, who testified at the hearing and with whom plaintiff has a high degree of mutual dependency despite his age, had never sought to have him evaluated for intellectual or cognitive limitations, viewing his problems as primarily physical. She was trained as a teacher so her testimony might have carried some weight on this issue. However, it appears that her perception of him was somewhat off. When plaintiff, in his testimony, attempted to explain his physical illnesses and his reasons

2

for quitting or losing the various jobs he had, it became apparent that there was some level of cognitive, social skill, or emotional impairment.

Plaintiff's counsel, at the hearing, therefore reaffirmed his request for further evaluation, and the ALJ concurred without hesitation. The ALJ proposed a consultative psychological examination. Plaintiff's attorney asked if that would include an IQ test, and the ALJ agreed that it would: "… I'll request a full psychological including literacy and IQ, and hopefully we'll get everything they can do for us but at least the IQ and the literacy." Plaintiff's attorney asked if that would include a neuropsychological examination, and the ALJ replied that he did not think the available consultants included that in their evaluation. He therefore advised plaintiff's attorney, "[i]f you would like to obtain a neuropsychological and are able to do that please do so and submit it as well. Certainly we can do [i.e., consider] that."

After adjourning the hearing, the ALJ referred the matter to Dr. David Mahony, a licensed psychologist. Dr. Mahoney met with plaintiff and his mother, interviewed plaintiff, and administered what is known as the Wechsler Adult Intelligence Scale, Fourth Edition, or "WAIS-IV," which he found to be a "valid and reliable estimate of current functioning." The WAIS-IV assigns numerical values to four cognitive indices (e.g., "Verbal Comprehension"), which, in turn, are comprised of numerical values assigned to two or three sub-tests within each index (e.g., "Vocabulary" as a sub-test of "Verbal Comprehension"). By comparing the results to "standard" scores, the psychologist is able to measure the patient's performance level.

Dr. Mahony's evaluation of these scores was that plaintiff had an IQ of 86, placing him in the low-average range. He concluded that plaintiff had "relative strengths in Perceptual Reasoning" and "relative weaknesses in Processing Speed." (Those are two of the four indices.)

In addition to WAIS-IV, Dr. Mahony administered a test called the "Bender Visual-Motor Gestalt," which he did "in order to ascertain a gross estimate of a claimant's ability to integrate perceptual and motor functions." This test also results in the assignment of a numerical value, which Dr. Mahony described as showing a "mild organic deficit" and "the lack of any severe organic deficit."

As to his evaluation of plaintiff based on the test results, his observations and verbal interview, Dr. Mahony was generally positive: "dressed casually and with good hygiene;" "eye contact was appropriately focused"; "Speech/language skills were adequate;" "attitude … was relaxed and friendly;" "stress response to instructions was adequate;" "recalled and understood all of the instructions;" "worked with reflection and deliberation;" "attention and concentration were good;" "did not evidence significant emotional distress during the evaluation." Dr. Mahony observed that plaintiff can "dress, bathe, and groom himself and help his mother out in the home" and "will be able to manage his own funds." The only somewhat negative observation was "style of responding was slightly slow in a trial and error approach."[1]

Dr. Mahony summarized his opinion as follows:

---

[1] There are some differences between the information Dr. Mahony elicited and the prior testimony before the ALJ. Dr. Mahony noted plaintiff's statement that he had "some friends," but the ALJ had already learned that when plaintiff says this, he is referring to his mother's friends, not his own, and that in fact he has no friends. In addition, Dr. Mahony expressed an inability to reconcile plaintiff's low-average IQ with his attendance in "gifted" classes as a child. He did note that since graduating high school, plaintiff had not engaged in any cognitive activities.

Plaintiff's mother had testified at the hearing that plaintiff had been exposed to lead paint and had suffered head injuries in a mugging and car accident starting when he was 11 or 12. These allegations are not in Dr. Mahony's report, probably because plaintiff or his mother did not mention them to him. Nevertheless, as the ALJ noted, there were no medical records to support this testimony or to suggest that it had any medical effect on plaintiff. In the instant case, plaintiff argues that by referencing the absence of evidence beyond plaintiff's mother's testimony for traumatic injury, the ALJ formed an unsupported medical conclusion that these prior incidents did not lead to or increase plaintiff's limitations. I do not read the ALJ's decision that way. Rather, the ALJ's decision in this regard flowed inexorably from Dr. Mahony's Medical Source Statement and Prognosis, which, in turn, were based on his observation, interview, and testing of plaintiff. Contrary to plaintiff's argument, if the ALJ had concluded that plaintiff's impairment resulted from lead paint, or a mugging or a car accident, the ALJ would have been reaching a medical opinion with no evidence in the record to support it.

> MEDICAL SOURCE STATEMENT: The claimant can follow and understand simple directions and instructions. He can perform simple tasks independently. He can maintain attention and concentration. He can maintain a regular schedule. He can learn new tasks. He can perform complex tasks independently. He can make appropriate decisions. He can relate adequately with others. He can appropriately deal with stress. Difficulties are caused by symptoms of depression.
>
> Results of the evaluation appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

For his diagnosis, Dr. Mahony opined that plaintiff had a "mood disorder," but that

> PROGNOSIS: Prognosis is good. The claimant apparently has a history of higher intellectual functioning in a gifted class. Since he left high school, he has not been involved in any sort of cognitive activities. He feels down regarding his medical illnesses and this is affecting his cognitive performance. He has not received any mental health treatment which he may benefit from.

Upon receipt of this report, the ALJ wrote to plaintiff's counsel, advising him that the ALJ was going to receive the report as part of the record, and further advising that plaintiff's counsel could submit argument and comments concerning the report; or submit additional records; or tender written questions about the report to Dr. Mahony; or request a supplemental hearing in which he could call additional witnesses or question Dr. Mahony. Plaintiff's counsel chose to not question Dr. Mahony further, whether by written questions or at a supplemental hearing, but instead submitted a brief that was essentially a critique of Dr. Mahoney's report.

Relying primarily on a treatise, Groth-Marnet, *Handbook of Psychological Assessment* (Wiley & Sons, 5th ed. 2009) (the "*Handbook*"), but other psychology treatises and articles as well, plaintiff's counsel argued that Dr. Mahoney had not given sufficient weight to plaintiff's "relative weakness in Processing Speed" (one of the four indices) and its two subtests, and alleged weakness in the "Similarities" subtest of the "Verbal Comprehension" index.

5

Additionally, using a different treatise, counsel argued that the Bender Visual-Motor Gestalt test should only be used in cases of severe brain damage. Based on these treatises (and counsel's argument about their meaning), plaintiff's counsel asked the ALJ, first, to find that plaintiff's performance on the Processing Speed Index and Similarities subtest required a finding of disability; or, alternatively, that Dr. Mahony's report should be interpreted as showing "functional limitations that erode [plaintiff's] available job base," the extent of such erosion to be determined by an opinion of a vocational expert.

In rejecting plaintiff's argument, it is clear that the ALJ seriously considered it, characterizing it as "persuasive" but ultimately speculative when compared to the reasoned and documented evaluation of Dr. Mahony. The ALJ applied the regulations for evaluating physical and mental disorders and found that based on Dr. Mahony's evaluation and plaintiff's medical records, plaintiff had a combination of impairments that rose to the level of "severe," but that combination did not meet any of the Listings of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and that plaintiff had sufficient residual functional capacity to perform sedentary work. The ALJ's finding of non-disability was affirmed by the Appeals Council, and plaintiff brought this action.

## DISCUSSION

Plaintiff makes three arguments on this appeal, but they all essentially boil down to one point: plaintiff has "nuanced deficits that render plaintiff unable to work rather than overarching cognitive limitations." This would have been apparent, plaintiff contends, if the ALJ had further

explored the WAIS-IV results, presumably through another consultative examination.[2] Plaintiff complains that "there was no opportunity to explore the limitations indicated by the IQ subtests" because the "test results were submitted after the hearing, and no supplemental hearing was arranged in order to address issues raised by plaintiff's attorney when the testing results were presented."

This last point is somewhat disingenuous. As noted above, the ALJ expressly invited plaintiff's attorney to request a supplemental hearing, or to get his own additional testing, or to put further questions to Dr. Mahony, whether in writing or in person at a hearing. Instead, counsel chose to submit a brief containing broad statements derived from treatises. Although it is true that "[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants ... affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding'", Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting, Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted)), this is not a case where there were other records in existence which the ALJ could have obtained, compare e.g. Jackson v. Astrue, No. 082010 WL 2585037, *3 (D. Conn. June 23, 2010), or where plaintiff required evaluation by someone with a field of expertise that had not been considered.

It must be remembered that plaintiff had never obtained any diagnosis or treatment for the cognitive condition that ended up forming the most substantial basis for his disability claim. Indeed, the ALJ had already appointed two consultative experts to deal with plaintiff's medical

---

[2] Only in the "Conclusion" section of her brief does counsel suggest what the ALJ might have done – "return[] to the consultative examiner for more information or … obtain[] medical expert testimony to explain the specific [test] results." The first option was offered to counsel's colleague and not pursued. The second option is effectively a request for another opinion. For the reasons set forth below, neither option is warranted.

issues; Dr. Mahony was the third consultant. In effect, while plaintiff never asked the ALJ for further development of the record, and has barely alluded in his brief in this case to what further development efforts the ALJ should have undertaken, what plaintiff requested of the ALJ and is requesting here is a second opinion on the issue of cognitive impairment because he disagrees with Dr. Mahony's evaluation.

I would agree with plaintiff that, notwithstanding the absence of any diagnostic or treatment history as to plaintiff's cognitive limitations, the ALJ should have done something more – perhaps another consultant – if there was anything in Dr. Mahony's report that showed or contained gaps or inconsistencies in the analysis of the cognitive condition. But there wasn't. We have a licensed psychologist administering standard cognitive evaluation tests, objective test results showing functionality well above the level for borderline mental retardation, and an interpretation by the psychologist based not only on the test results but on his own observations that is only consistent with a finding of sufficient residual functional capacity to perform sedentary work. Moreover, the psychologist's conclusions are fully consistent with all the other objective facts in the record, including, as he mentioned, the fact that plaintiff was in gifted classes, that he never attended special education classes, and that he graduated with a standard (non-special education) high school diploma.

I would further agree with plaintiff that, even in the absence of any apparent shortfalls in Dr. Mahony's report, persuasive evidence by way of treatises or other studies in the field might have compelled the ALJ to undertake further inquiry. But I find the material cited by plaintiff in his post-hearing brief to the ALJ (and again cited before me) even less probative than did the ALJ. As compared to the specific, patient-centered analysis that Dr. Mahony undertook,

8

plaintiff's treatises make broad general statements (as treatises must) about test results that may or may not apply to any particular individual.

Every excerpt from the treatises quoted by plaintiff to the ALJ may well be perfectly valid and yet none of them, separately or collectively, in any way cast doubt on Dr. Mahony's conclusions. They are all qualified remarks about what a psychologist might find in interpreting plaintiff's selected test results. For example, plaintiff emphasized[3] to the ALJ one of the statements from the *Handbook*: "Low scores [on the Symbol Search subtest of the Processing Speed index from the WAIS-IV test] *suggest* slow mental processes; visual-perceptual difficulties; poor motivation and/or anxiety; difficulties with short-term visual memory; and a reflective, perfectionistic, or obsessive problem solving style." (Emphasis added). This does not mean that someone with low scores on this subtest (as plaintiff, according to Dr. Mahony, had) would have any or all of these conditions. And, in fact, Dr. Mahony found that plaintiff's "style of responding was slightly slow in a trial and error approach," a finding that is fully consistent with the quoted passage from the *Handbook*. Similarly, plaintiff emphasized the statement in the *Handbook* that "Lower scorers [on the digit-symbol coding subtest of the Processing Speed index in the WAIS-IV] *may* have reduced capacity for visual associative learning, impaired visual motor functioning, and poor mental alertness." (Emphasis added). I do not see any way in which this generalization calls Dr. Mahony's conclusions into question.

This is not to say that plaintiff is without a cognitive impairment. As noted above, it is obvious from the transcript, and the ALJ found it to be severe. Dr. Mahony agreed that plaintiff has "psychiatric problems" and recommended treatment for them. But the question before the

---

[3] When I say plaintiff "emphasized to the ALJ," I mean that plaintiff's submission quoted long passages from the *Handbook*, but certain sentences in those passages were set forth in bold-face.

9

ALJ was whether plaintiff had met his burden to prove disability, and the ALJ had to make that determination based on the evidence he developed to specifically address that question.

It may well be the case that the "nuanced" evaluation that plaintiff urges, leading to a finding of disability, is just too difficult in the context of someone with no psychiatric treatment history and thus no treating physician, relatively high achievement, no school record suggesting cognitive impairment, and no complaints about any such impairment. The ALJ expressly recognized this problem, noting that he had to decide the case based on the evidence of record, not a speculative application of the *Handbook* and other psychology writings to which plaintiff's counsel had cited. Moreover, it is clear from both the receptive and courteous attitude displayed by the ALJ during the hearing and the thoroughness of his decision that the ALJ meticulously considered the evidence in this case and made every effort to make sure he had a complete record upon which to base his decision.

Thus, because Dr. Mahony's report, together with the other evidence in the record, did not disclose any gaps in the evaluation of plaintiff's cognitive impairment, the ALJ had no duty to obtain more evidence concerning that impairment. Nor did the ALJ improperly arrive at any of his own medical opinions; Dr. Mahony's report gave the ALJ all the facts that he needed to draw the inferences that he did in his decision. For similar reasons, Dr. Mahony's report and the other facts in the record constitute substantial evidence for that decision.

## CONCLUSION

Defendant's motion for judgment on the pleadings is granted and plaintiff's motion for judgment on the pleadings is denied. The Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**

                                          Digitally signed by Brian M. Cogan
                                                                             U.S.D.J.

Dated: Brooklyn, New York
          July 19, 2013